RECEIVED
IN LAKE CHARLES, LA

APR - 4 2007

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| JOYCE SPILLMAN, Individually and as Natural Tutrix of her Minor Child, BRANDON DWAYNE DICKS | : | DOCKET NO. 2:05 CV 450 |
| VS. | : | JUDGE MINALDI |
| SOUTHWEST LOUISIANA HOSPITAL ASSOCIATION, ET AL. | : | MAGISTRATE JUDGE WILSON |

## MEMORANDUM RULING

Before the court is a Motion for Summary Judgment [doc. 51] filed by Christus Health Southwestern Louisiana ("Christus Health"). The plaintiff, Joyce Spillman, filed an opposition, to which Christus Health filed a reply. Oral arguments were held on March 28, 2007.

### BACKGROUND

On the morning of February 22, 2004, Joyce Spillman brought her minor son, Brandon Wayne Dicks, to the Emergency Room at Lake Charles Memorial Hospital ("LCMH").[1] Dicks complained of severe abdominal pain, including right lower quadrant (RLQ) abdominal pain.[2] The physician at LCMH did not run any tests on Dicks, but diagnosed him with "acute gastritis," prescribed medication for nausea, and sent him home.[3] In addition to RLQ pain, the plaintiff alleges

---

[1] Pet. ¶¶ 4-5.

[2] Id. at ¶ 4.

[3] Id. at ¶ 7.

1

that he had other signs and symptoms of appendicitis, including nausea, vomiting, and lab findings including high neutrophils and low lymphocytes.[4]

Dicks continued to experience pain.[5] Approximately three hours after being discharged from LCMH, Spillman took Dicks to the ER at Christus St. Patrick Hospital ("CSPH") on the advice of his pediatrician.[6] The ER physician at CSPH ordered a CT scan which was allegedly suspicious for appendicitis.[7] However, it is unknown whether the ER physician was ever notified of this result.[8] Dicks was prescribed medication for pain and discharged from CSPH that evening.[9]

Continuing to experience pain, Dicks's mother brought him to his family doctor at Bayou Comprehensive.[10] The physician accessed the CT report from CSPH and determined that Dicks's appendix had ruptured.[11] He was immediately taken to LCMH for emergency surgery.[12]

On February 22, 2005 Spillman filed suit, individually and on behalf of Dicks, in the 14th Judicial District Court, Parish of Calcasieu, State of Louisiana. The action was removed to federal court and, on May 26, 2005, came before the court on motions to dismiss filed by defendants

---

[4] *Id.* at ¶ 8.

[5] *Id.* at ¶ 9.

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*; Christus Health's Ex. A at 55-56 (Medical Records).

[10] *Id.* at ¶ 10.

[11] *Id.*

[12] *Id.*

2

Southwest Louisiana Hospital Association ("SWLA Hospital Association") and Christus Health. After hearing oral arguments, the motions to dismiss were granted as to the "Patient Dumping" claim under Louisiana Revised Statues 40:2113.4 and denied as to the claim under the Emergency Medical Treatment and Labor Act (hereinafter "the EMTALA" or "the Act"), 42 U.S.C. 1395dd. The plaintiff voluntarily dismissed the medical malpractice claim.

Thus, the only remaining claim against the defendants is the EMTLA claim, which is the subject of the instant motion for summary judgment filed by Christus Health.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant is able to demonstrate that the pleadings, affidavits, and other evidence available to the Court establish that there are no genuine issues of material fact, and that the moving party is entitled to summary judgment as a matter of law. FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25, 106 S.Ct. 2548, 2552-54 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-88, 106 S.Ct. 1348, 1355-57 (1986). When the nonmoving party has the burden of proof on an issue, the movant must state the basis for the motion and identify those portions of the pleadings, depositions, admissions, answers to interrogatories, together with affidavits, that demonstrate the absence of a genuine issue of material fact.[13] *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *Topalian v. Ehrman,* 954 F.2d 1125, 1131-32 (5th Cir.1992), cert. denied, 506 U.S. 825, 113 S.Ct. 82 (1992). A mere

---

[13] A "material" fact is one that might affect the outcome of the suit under the applicable substantive law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. In order for a dispute to be "genuine," the evidence before the Court must be such that a reasonable jury could return a verdict for the nonmoving party. *Id.*; *see also Judwin Properties, Inc. v. United States Fire Ins. Co.,* 973 F.2d 432, 435 (5th Cir.1992).

conclusory statement that the other side has no evidence is not enough to satisfy a movant's burden. *See Celotex,* 477 U.S. at 328, 106 S.Ct. at 2555.

Once the movant has shown the absence of material factual issues, the opposing party has a duty to respond, via affidavits or other means, asserting specific facts demonstrating that there is a genuine issue for trial. FED.R.CIV.P. 56(e); *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514; *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. The Court must view the evidence introduced and all factual inferences from the evidence in the light most favorable to the party opposing summary judgment. *Eastman Kodak v. Image Technical Services,* 504 U.S. 451, 456-58, 112 S.Ct. 2072, 2077 (1992); *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. However, a party opposing summary judgment may not rest on mere conclusory allegations or denials in his pleadings. FED.R.CIV.P. 56(e); *see also Topalian,* 954 F.2d at 1131.

## ANALYSIS

The EMTALA was enacted "to prevent 'patient dumping,' which is the practice of refusing to treat patients who are unable to pay. *Battle v. Memorial Hosp.*, 228 F.3d 544, 557 (5th Cir. 2000) (quoting *Marshall v. East Carroll Parish Hosp.*, 134 F.3d 319, 322 (5th Cir. 1998)). "The act requires that participating hospitals[14] give the following care to an individual who is presented for emergency medical care: (1) an appropriate medical screening, (2) stabilization of a known emergency medical condition, and (3) restrictions on transfer of an unstabilized individual to another medical facility." *Id.* (citing 42 U.S.C. § 1395dd(a)-(c)).

---

[14] "Because hospitals can act and know things only vicariously through individuals, any EMTALA violation by...a physician [who treat patients in fulfillment of their contractual duties with the hospital] is also a violation by the hospital." *Battle,* 228 F.3d at 557 (quoting *Burditt v. U.S. Dep't of Health & Human Servs.*, 934 F.2d 1362, 1374 (5th Cir. 1991) (alteration in original)).

*Screening*

With regards to medical screening, the Act provides:

> In the case of a hospital that has a hospital emergency department, if any individual...comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

42 U.S.C. § 1395dd(a). An "emergency medical condition" is defined, in pertinent part, as:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--
>     (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
>     (ii) serious impairment to bodily functions, or
>     (iii) serious dysfunction of any bodily organ or part....

42 U.S.C. § 1395dd(e)(1). If it is determined that the patient has an emergency medical condition, the hospital must either stabilize the patient or transfer the patient to another medical facility. 42 U.S.C. § 1395dd(b)(1).

The EMTLA, however, "was not intended to be used as a federal malpractice statute." *Marshall*, 134 F.3d at 322. Thus, "an EMTALA 'appropriate medical screening examination' is not judged by its proficiency in accurately diagnosing the patient's illness, but rather by whether it was performed equitably in comparison to other patients with similar symptoms." *Id.* Accordingly, "[a] hospital's liability under EMTALA is not based on whether the physician misdiagnosed the medical condition or failed to adhere to the appropriate standard of care. Instead, the plaintiff must show that the hospital treated him differently from other patients with similar symptoms." *Battle*, 228 F.3d at 557 (citing *Marshall*, 134 F.3d at 322, 324) (internal citation omitted). If the hospital provided an

appropriate medical screening examination, it is not liable under the EMTALA even if the treating physician would be liable for malpractice under state law. *Marshall*, 134 F.3d at 322-23.

In order to avoid summary judgment, Spillman must present evidence showing an issue of material fact as to whether CSPH provided Dicks with an EMTALA appropriate medical screening examination. *Id.* at 323. Although the phrase an "appropriate medical screening examination" is not defined by the EMTALA, the courts have interpreted it to mean "a screening examination that the hospital would have offered to any other patient in a similar condition with similar symptoms." *Id.* at 323.

Christus Health contends that there is no evidence that CSPH normally treats patients with abdominal pain any differently than it treated Dicks. It further asserts that the plaintiff, in her Opposition to Defendants' Motions to Dismiss, conceded that the CT scan ordered at CSPH was "an appropriate screening test."[15]

Spillman argues that while she conceded that the CT scan is an appropriate screening test for appendicitis, she did not concede that a single scan constitutes an appropriate medical screening examination under the EMTLA. She argues that this is especially so where the radiology report indicates that the CT scan was inadequate to evaluate the appendix. Spillman further asserts that at the time of her opposition to the defendants' motions, it was not known how the CT report was communicated to the ER.

The essence of Spillman's opposition is that the physicians and personnel at CSPH did not conduct an adequate physical examination of Dicks. Spillman points to the affidavit of her expert,

---

[15] *See* Pl.'s Opp. to Defs.'s Mots. to Dismiss 2 [doc. 23] ("At St. Pat's a CT Scan was done (this was an appropriate screening test which had not been done at Lake Charles Memorial Hospital).").

6

Dr. Terrance L. Baker, who testifies that once appendicitis is "included in the differential diagnosis, it remains there until ruled out by either an ultrasound or CT scan which identifies a normal appendix, or by referring the patient to a surgeon who assumes responsibility for the patient."[16] Spillman also argues that a communication breakdown occurred at CSPH when inaccurate CT results were relayed over the phone to nurse practitioner Tim Neidigh.[17] Dr. Baker's affidavit is also offered in support of this argument.

Spillman contends that because CSPH's examination of Dicks fell below the applicable standard of care, CSPH failed to provide an EMTALA appropriate medical screening examination. At oral argument, Spillman's attorney suggested that to prove anything other than a deviation from the standard of care– i.e., that Dicks's treatment deviated from that of any other patient with similar symptoms– is virtually impossible. Though the court agrees that it is difficult to obtain such evidence, it is not impossible.

In *Owens v. Nacogdoches County Hospital*, 741 F.Supp. 1269 (E.D. Tex. 1990), the court found a pattern of dumping of indigent patients. The court based this finding upon the testimony of several individuals, including a physician who practiced at the responsible hospital for nine and one-half years. *Id.* at 1280-81. In *Martinez v. Porta*, No. 4:03CV915Y, 2006 WL 3289187 (N.D.Tex. Nov. 1, 2006), the district court upheld the magistrate judge's order requiring the hospital to produce medical records from patients with similar symptoms and treatment as the EMTALA claimant. The records were to be produced at the hospital's expense and their production was subject to a protective order to protect sensitive health information. *Id.* at *1.

---

[16] Pl.'s Ex. C at 3 (Baker Aff.).

[17] *Id.* at 6-7.

In sum, while the above facts may indeed form the basis of a medical malpractice claim, they do not support a claim under the EMTALA for failure to provide an appropriate medical screening examination. There is, in fact, no evidence that CSPH normally treats patients with abdominal pain any differently than it treated Dicks.

### *Stabilization or Transportation*

A hospital's duty to stabilize or transport under the EMTLA does not apply unless an emergency medical condition has been diagnosed. *See Marshall*, 134 F.3d at 324-25; *Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir. 1994) (citing *Baber v. Hosp. Corp. of America*, 977 F.2d 872, 883 (4th Cir. 1992)); *Vickers v. Nash General Hosp., Inc.*, 78 F.3d 139, 145 (4th Cir. 1996) ("The Act does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware."); *cf. Battle*, 228 F.3d at 559 (judgment as a matter of law improvidently granted as to stabilization claim where there was a written diagnosis of seizure disorder). In the instant case, there is no evidence that the ER physician at CSPH diagnosed Dicks with an emergency medical condition within the meaning of the Act.

Before Dicks was discharged from CSPH, nurse practioner Neidigh received a phone call from the on-call radiologist with the preliminary results of Dicks's CT scan.[18] According to Neidigh, the radiologist reported that the "appendix area looks okay. No mass or inflamation noted."[19] However, sometime after CSPH discharged Dicks, Dr. George L. Miller, a radiologist, dictated a full report on the CT scan in which he stated, "POSSIBLE FLUID FILLED DILATED APPENDIX

---

[18] Christus Health's Ex. B at 22 (Neidigh Aff.).

[19] *Id.*

8

SEEN IN THE RIGHT LOWER ABDOMEN/PELVIS....THE POSSIBILITY OF APPENDICITIS CAN NOT BE EXCLUDED OR CONFIRMED."[20]

Although Dr. Miller's report suggests that Dicks may have been prematurely discharged, it is not indicative of a diagnosis of appendicitis. Spillman suggests that since the ER physician ordered the CT scan to rule out appendicitis, the "presumptive diagnosis" was appendicitis. The court is unable to find nor does the plaintiff cite any cases which support the theory that a presumptive diagnosis triggers a hospital's duty to stabilize or transport under the EMTALA.

At CSPH, Dicks was not diagnosed with an emergency medical condition, but rather with "abdominal pain."[21] The medical records indicate that Dicks was given pain medication and at his last examination before discharge, denied any pain.[22] Finally, Dicks's condition at discharge was listed as "Stable."[23]

## CONCLUSION

Although the plaintiff may have a cognizable and possibly successful claim for medical malpractice, there is insufficient evidence to create an issue of material fact regarding the EMTALA claim. Accordingly Christus Health's Motion for Summary Judgment [doc. 31] will be granted and

---

[20] Christus Health's Ex. A at 62 (Radiology Report).

[21] Christus Health's Ex. A at 54 (Medical Records).

[22] *Id.* at 55.

[23] *Id.* at 56; *see also* Christus Health's Ex. B at 35-36 (Neidigh Depo.).

the EMTALA claim against Christus Health dismissed.

Lake Charles, Louisiana, this \_\_4\_\_ day of \_\_April\_\_, 2007.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE